428

Argued October 30, affirmed December 29, 1972, petition for
rehearing denied February 13, 1973

# G & M RANCHES, INC. ET AL, *Respondents, v.*
## PACIFIC GAMBLE ROBINSON CO.,
### *Appellant.*

504 P2d 706

*Douglas A. Shepard,* Madras, argued the cause and filed the briefs for appellant.

*James F. Larson,* Prineville, argued the cause for respondents. With him on the brief were Bodie & Minturn, Prineville.

PER CURIAM.

This is an action for breach of a contract to purchase potatoes. Defendant appeals from a judgment for $21,310 entered in favor of plaintiffs and assigns as error the refusal of the trial court to grant its motion for a nonsuit and a directed verdict.

The defendant, Pacific Gamble Robinson Co., is a Delaware corporation doing business in Oregon as Pacific Fruit and Produce Company. Defendant operates a branch plant in Prineville where it stores, grades, and markets potatoes grown in that area. Plaintiffs are engaged in raising potatoes.

In February 1970 the defendant orally agreed to purchase plaintiffs' 1969 crop which was being stored in defendant's plant at the time. The parties were aware that plaintiffs' potatoes were infested to some extent with a disease commonly known as leaf roll or internal browning, which affects the interior of the potatoes.

The contract between the parties called for plaintiffs to be paid the net market price at the time of grading for No. 1 and No. 2 potatoes. Potatoes which grade less than No. 2 are sold as culls for cattle feed. When potatoes are sold on a net price, the buyer bears all expenses, and the price granted to the grower is net to the grower. The potatoes must be inspected by employees of the U. S. Department of Agriculture and are required to meet certain grading standards before they can be shipped.

Some of plaintiffs' potatoes were "run" (sorted and graded) by defendant on May 6 and 7, 1970. The inspectors would not initially certify the potatoes because samples tested did not meet the required standards. At first the defendant refused to grade any more of the plaintiffs' potatoes. However, the defendant subsequently agreed to run more of the remaining potatoes, using a method whereby the larger potatoes (which generally are more affected by browning) are not included in the grading. Additional potatoes were graded on May 26 and 27, and again the inspectors initially refused to certify them. Thereafter, defendant refused to run any more of plaintiffs' potatoes and the remaining 2,687,040 pounds were sold as culls for cattle feed. Plaintiff received $2,687.04 for the culls.

The defendant contends that the agreement between the parties did not require defendant "to run

all of plaintiffs' potatoes over the grader, but only the potatoes that were marketable." Therefore, according to defendant, when the inspectors rejected some of the potatoes because they did not meet tolerance limitations, the defendant was justified in refusing to grade the balance. The issue is one of fact, and the evidence clearly supports the action of the trial court in denying the motions for a nonsuit and a directed verdict.

■ There was substantial evidence that defendant agreed to grade all, not a portion, of the potatoes purchased from plaintiffs. At the time of the agreement between the parties, the defendant was going to be picketed by the National Farm Organization, which was protesting the prices paid by processors to the growers. According to plaintiff Bill McPhetridge, the defendant's manager told him that if he "would stay out of the NFO holding action" defendant would purchase the potatoes and "run every damn one of them"; also that "he would run my spuds in spite of hell and high water." The deposition of the defendant's manager was read into the record, and he stated:

" 'Q Going back to this evening in February, about the 22nd or 23rd, in there, when Bill's sister-in-law was down, you said that you told him you would process his potatoes. Now, what was your understanding of that?

" 'A I told him I would run the potatoes.

" 'Q You would run them?

" 'A Right.

" 'Q What did you mean by that when you told him that?

" 'A We intended to—Just what it implies; we intended to run his potatoes.

" 'Q And you intended to run all of them?

" 'A You bet.' "

Moreover, the evidence discloses that although the potatoes graded on May 7 did not initially meet the inspection requirements, nevertheless they were sold and shipped by defendant, and plaintiffs were paid for them. The defendant first refused to grade any further, but with the plaintiffs' approval, if not their request, defendant resumed grading the plaintiffs' potatoes on May 26 and 27, using the different method of culling out the larger ones. Again the inspectors initially rejected the grade based on samples taken. However, the defendant did pay plaintiffs for these potatoes. Defendant then refused to grade any more of the potatoes, and those remaining were sold as culls.

There was ample evidence for the jury to find that defendant breached its contract when it refused to grade the balance of plaintiffs' potatoes.

■ The defendant also contends that the damages cannot be sustained because they were speculative.

After the defendant advised plaintiffs on May 7 that it refused to grade further, the parties agreed to another grading on May 26 and 27. The method used in the later grading and the result were satisfactory to plaintiffs. We conclude that the breach occurred when defendant refused to grade further after the May 27 grading. At that time the balance of potatoes on hand amounted to 2,687,040 pounds, and there was evidence from which the jury could find that the remaining potatoes were basically the same as the potatoes graded on May 26 and 27.

■ The direct evidence of the oral agreement between plaintiffs and defendant does not specify what was to be done with the culled potatoes. The proof

shows that when defendant refused to grade the potatoes on the basis that they were not fit to grade, they were sold as culls and the plaintiffs were paid the money by the purchaser. The jury could infer from this conduct that the agreement between the parties was to sell the culls for plaintiffs' benefit. That is what was actually done.

It is undisputed that the final run of potatoes graded at 33% No. 1's selling for $2.50 per hundred pounds, and 4% No. 2's selling for $1.30 per hundred pounds.

The computation of plaintiffs' damages on this basis would be as follows:

*No. 1 Potatoes*

33% of
2,687,040 lbs. = 886,723.2 lbs.

$2.50 ×
8,867.232 lbs. =                    $22,168.08 damages

*No. 2 Potatoes*

4% of
2,687,040 lbs. = 107,481.6 lbs.

$1.30 ×
1,074.816 lbs. =                    +1,397.26 damages

Total Damages               $23,565.34

Less 37% of previous payment
of $2,687 for No. 1 and No. 2
potatoes at cull prices            —994.19

                                    $22,571.15

Judgment was entered for $21,310.07, which was less than the maximum of $22,571.15 which the jury

could have found as owing. Therefore, the judgment should be sustained in its entirety.

Affirmed.

McALLISTER, J., concurs in the result.